UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

FRANCIS WHITE

Criminal No. 03-CR-10356-MLW

### AFFIDAVIT OF PATRICIA A. DEJUNEAS, ESQUIRE
### REGARDING FALSE AND MISLEADING ALLEGATIONS
### IN WIRETAP AFFIDAVITS

I, Patricia A. DeJuneas, on oath depose and state as follows:

1.  I, along with Richard M. Egbert, represent Mr. Francis White in connection
    with the pending charges.

2.  I have carefully and extensively reviewed the various affidavits submitted to the
    Massachusetts Superior Court by Trooper Russolillo, in connection with the
    wiretap investigation that led to the pending charges, and am also familiar with
    Massachusetts and federal law concerning wiretaps.

3.  Based upon that review, I believe the following allegations to be false and/or
    misleading:

### ALLEGATIONS PERTAINING TO NECESSITY

4.  Based upon my review of the relevant law, Russolillo's affidavits, and other
    documents, I believe that Trooper Russolillo intentionally made the following
    false statements in his affidavit dated September 1, 2000, each of which
    concerns the necessity requirement:

    (a) In my opinion, normal investigative procedures have been
        tried and have failed to generate sufficient evidence to
        identify, apprehend and successfully prosecute all members
        of Frederick Simone's extortion and gaming organization;
        to expose the full scope of the gaming, criminal usury and
        extortion activities of Simone and the other organization
        members; to reveal where the proceeds of Simone's

1



extortion, criminal usury and gaming activities have been
spent, stored, or invested; and to dismantle permanently the
criminal activities of the organization members. Continued
exclusive reliance on normal investigative procedures
likewise will almost certainly prove futile. As such, we
believe that the best available means of identifying,
apprehending and prosecuting all the members of this
organization, and to achieve all of the goals of this
investigation, is the use of court authorized electronic
monitoring. 9/1/00 Aff. at p. 79.

(b) Although Lieutenant Tutungian and I continue to receive
information from several of the informants discussed
earlier in this affidavit, these informants are unable to
penetrate sufficiently far into the organization to enable law
enforcement to achieve the goals of this investigation using
only normal investigative procedures. Moreover, these
confidential informants have provided cooperation and
assistance to law enforcement on the conditions that their
identities remain concealed and they not be compelled to
offer testimony against Frederick Simone or his associates.
I continue to believe that attempts to have the informants
further penetrate this organization as law enforcement
agents would place them at substantial risk of being
discovered and placing them at substantial risk of being
threatened or harmed. 9/1/00 Aff. at 80.

(c) I continue to know of no person willing to assist law
enforcement in this investigation who has sufficient first-
hand information to bring about the achievement of the
goals of this investigation based exclusively on normal
investigative procedures. Without the corroboration of
electronic surveillance, even the testimony of the named
cooperating individual, Robert Luisi, Jr., discussed in this
affidavit, will be viewed in light of the circumstances
surrounding this cooperation and his antagonistic
relationship with Simone.... 9/1/00 Aff. at pp. 80-81.

(d) It is also my opinion that attempting to persuade Frederick
Simone or any of his associates to cooperate, or inviting
any of them to testify before a grand jury, would be futile
and would jeopardize the objectives of this investigation.
If any of these persons refused to cooperate, he or she
would likely alert the other members of the organization to
the existence of this investigation, making it much more
difficult, if not impossible, to identify, apprehend and

prosecute all the members of Simone's illegal organization. 9/1/00 Aff. at pp. 81-82.

(e) Although police officers assigned to this investigation continue to conduct periodic physical surveillance of Frederick Simone and his associates, it remains my opinion that conducting prolonged or extensive surveillance, and/or trash analysis, poses an unacceptable risk that surveillance officers will be detected. I continue to believe that physical surveillance unaccompanied by electronic surveillance will not enable law enforcement to achieve the goals of this investigation. 9/1/00 Aff. at p. 82.

5. Identical allegations concerning necessity appear[1] in:

   (a) 9/19/00 Aff. at pp. 20-24;
   (a) 10/4/00 Aff. at pp. 47-51;
   (b) 10/24/00 Aff. at pp. 47-51;
   (c) 11/10/00 Aff. at pp. 37-42; and
   (d) 11/22/00 Aff. at pp. 28-33.

6. Russolillo's allegations of necessity in this particular wiretap investigation are nearly identity to those he made in the Essex wiretap investigations as well. See Exh. A-E, attached hereto.

**MISLEADING ALLEGATIONS REGARDING PURPORTED TARGETS VINCENT ROBERTO AND MICHAEL DEZOTELL**

7. Based upon my review of the relevant law and the discovery produced in this case, I believe that Trooper Russolillo intentionally misled the Massachusetts State Court about the true status of Vincent Roberto and Michael Dezotell insofar as he went to get great lengths to attempt to portray Roberto and Dezotell as co-conspirators, despite their true status as informants. The following allegations -- quoted directly from the affidavits -- further falsely give the impression that law enforcement was seeking to gather evidence to be used against Roberto and Dezotell, when in fact they had absolutely no intention of doing so.

   (a) Based upon the information set forth in this affidavit, as well as on my training and experience, I have probable cause to believe that Frederick Simone, Francis White, Vincent Roberto and others are part of on ongoing conspiracy to commit the crimes of gaming in violation of

---

[1]    The differences between the allegations of necessity in each successive affidavit are negligible. For example, differences include the expansion of the list of targets, new telephones, and the bug for Simone's home.

M.G.L. ch. 271 §§ 16A, 17 & 17A, criminal usury and
extortion in violation of M.G.L. ch. 265, § 25, respectively.
I also have probable cause to believe that evidence of these
crimes can be obtained by intercepting wire
communications occurring over [the target Simone
telephones]. 9/1/00 Aff. at 78.

(b) Luisi described Roberto as being "with" Simone...Roberto now pays
Simone. Id. at p. 22.

(c) Intercepted telephone conversations and physical surveillance in [the
Essex] investigation showed that Anthony Musto (who will be detailed
later in this affidavit), is delivering Roberto's and Kotsiopoulos's rent
payments to Simone and, on at least one occasion, made Kotsiopoulous's
rent payment to Simone himself. Id.

(d) Conversations intercepted during this investigation revealed that Frederick
Simone currently controls two (2) interconnected gaming organizations
through the systematic extortion of "rent" payments from the individuals
who control these bookmaking organizations. One organization is headed
by Vincent Roberto and is referred to in this affidavit as the "Roberto
Gaming Organization." Id. at p. 29.

(e) On March 24, 2000, at the conclusion of the Essex wiretap investigation, a
search warrant was executed by the Broward County Sheriff's Office at
Vincent Roberto's residence at 510 North Ocean Boulevard, Apt. 208,
Pompano Beach, Florida, which is located in Broward County, South
Florida. The search turned up numerous gaming records, many of which
bore the names and telephone numbers of individual s who had been
identified by Roberto and Musto on the telephone as agents and/or bettors
involved with the Roberto gaming organization. I have personally
reviewed copies of documents seized from Roberto's home, which were
provided by Det. Thomas Anderson of the Broward County Sheriff's
Department. References to Frederick Simone were uncovered in the
search of Roberto's residence. A telephone book seized from Roberto's
home also listed "fred-508-788-1035." The same telephone number is
also listed in the same book next to the notation "Neibor." I have listened
to calls, which will be explained later in this affidavit, in which Roberto,
Musto and Keegan refer to the "neighbor."" Id. at p. 27.

(f) Vincent Roberto's involvement in illegal organized gaming dates back at
least 10 years. Lieutenant Tutungian advised me that in 1990 and 1991 he
was the lead officer in a wiretap investigation of illegal gaming activities
by Vincent Roberto. Conversations intercepted during that investigation
reveals that Roberto supervised a large-scale illegal gaming operation that
employed several agents and clerks and generated lucrative profits. Id.

4

(g) During the course of the Essex wiretap investigation, I learned through intercepted telephone conversations and physical surveillance, that Vincent Roberto runs On the Square Realty, a realty business located at 580 Washington Street, Brighton, Massachusetts. Records obtained from the Massachusetts Secretary of State show that the president and treasurer of On the Square Realty is Vincent Roberto's wife, Miriam Roberto. Roberto has also been observed at this location numerous times by myself and other members of the Special Services Section. These observations were made in the last couple of years, particularly during the summer months when Roberto resides in Massachusetts. Calls intercepted in the recent Essex county wiretap also included Roberto discussing ongoing real estate transactions. Id. at p. 31.

(h) As described in greater detail later in this affidavit, FBI source information received on October 29, 1999, revealed that "rent payments" from bookies were dropped off to Roberto's office on the first day of every month. Id.

(i) On March 24, 2000, a search warrant was executed at 580 Washington Street in Brighton. Among the items seized were eight monthly telephone bills within the period from may 1998 to March 2000. These bills reveal that in these eight months, 38 calls were made from 508 Washington Street to (508) 877-9636 (a telephone number previously listed to Simone and referred to as the Simone C Telephone) and two calls were made to (508) 788-1035 (Simone A Telephone). As previously mentioned telephone records from RCN reveal that telephone number (508) 877-9636 was a telephone number previously subscribed to by F. Simone of 32 Lowther Road, Framingham, Massachusetts. Id. at pp. 31-32.

(j) Several conversations were intercepted during this investigation in early calendar year 2000, in which Vincent Roberto and Anthony Musto refer to Simone's collection of "rent" from Roberto, Musto, and Chris Kotsiopoulos. In these calls which I have listened to, Simone is referred to as "the neighbor," "the boss," or "272." I believe that "the neighbor" is one of Simone's nicknames because Simone and Roberto live minutes away from each other in Framingham; because Anthony Musto was intercepted on the telephone saying that he was with "the neighbor" at a time when surveillance officers observed that he was inside Simone's Framingham residence; and because the March 24, 2000 search of Vincent Roberto's Florida residence turned up a telephone book that bore the name "neibor" followed by 788-1035, Simone's home telephone number (Simone A Telephone). Id. at pp. 32-33.

(k) On March 8, 2000, at approximately 11:21 a.m., a call was intercepted between Anthony Musto and Vincent Roberto in which Musto told

Roberto about various agents and/or bettors whom he has contacted. Roberto told Musto to look for "272" and then mentioned the name "Smiley," (Kotsiopoulos), Musto responded, "he didn't pay you yet for that thing?" Roberto replies, "no, who's he going to pay, who's he got to pay?" Based on my training and experience, my participation in the Essex wiretap investigation, and my knowledge of the calls that occur before and after this one (described below), it is my opinion that in this conversation Roberto is instructing Musto to pay money (or "rent") to Simone (a.k.a. "272") on behalf of Chris Kotsiopoulos ("Smiley"). (A transcript of this conversation is attached hereto as Exhibit 7 and incorporated herein.) Id. at p. 33.

(l) The following day, March 10, 2000, Trooper Scanlan conducted surveillance at Vincent Roberto's business, On the Square Realty, at 580 Washington Street in Brighton. Trooper Scanlan saw Musto enter the office at approximately 1:30 p.m. and Kotsiopoulos enter at approximately 2:15 p.m. In light of Musto's conversations with Kotsiopoulos and Keegan on March 9 (indicating that Musto would meet Kotsiopoulos the next day), it is my opinion that his meeting is consistent with Musto and Kotsiopoulos could reimburse Musto for paying "rent" to Simone on Kotsiopoulos's behalf the day before. Id. At pp. 37-38

(m) On March 15, 2000, at approximately 2:-6 p.m. a call was intercepted between Vincent Roberto in Florida and Anthony Musto in Massachusetts. Roberto mentions the fact that Musto earlier "had to drive the boss [i.e. Simone] to the airport." In light of the call described next, it appears that Simone traveled to Florida. On March 17, 2000, at approximately 7:04 p.m., another call was intercepted between Roberto in Florida and Musto in Massachusetts. After the two men reviewed amounts owed by various agents and/or bettors, Roberto tells Musto, "I'm goin' to get your boss right now, your other boss." Musto responds, "Which one? I've got so fuckin' many of them." Roberto answers, "the neighbor," Musto replies, "oh, the neighbor." And adds, "he's everybody's boss" (emphasis added). Roberto explains that this person and demanded money from him, but Roberto had refused, giving as his reason that he had only seven or eight hundred dollars and "it's gotta last til I go home." In my opinion, these conversations indicated that while Simone was on a trip to Florida, he visited Roberto and asked him for money which Roberto claims to have resisted. Further, in this telephone call the two men acknowledge that Roberto is Musto's boss, but that Simone, "the neighbor," is the "boss" of both of them. (A transcript of this conversation is attached hereto as Exhibit 12 and incorporated herein.) A year earlier, on May 17, 1999, FBI source information indicated that Vinny Roberto was upset with Simone. Roberto borrowed money from Simone. The Source stated Simone charged him "juice" (high interest). Roberto was upset because he turned in bookmakers to Simone for tribute.

Roberto, according to this source, needed money to pay off his home that was being foreclosed upon. Id. at pp. 38-39.

7. Russolillo's affidavit dated September 19, 2000 also redounds with misrepresentations about Roberto and Dezotell's true status. For example, Russolillo alleged the following, all designed to convince the Massachusetts Superior Court that Roberto and Dezotell were targets/co-conspirators and that investigators were seeking to build a prosecution against them:

    (a) If these warrants are issued, it is expected that the Simone Cellular Telephone together with the Simone A Telephone will continue to be used by Frederick Simone, Francis White, John Demarco, Vincent Robert, Michael Dezotell and others whose identities are not as yet known to conduct their ongoing illegal activities. 9/19/00 Aff. at p. 24.

    (b) Officers have intercepted criminal communications between Simone and other individuals including but not limited to Michael Dezotell and Anthony Musto over the Simone Cellular Telephone...As detailed in my first affidavit dated September 1, 2000, Musto was responsible for payment of "rent" from Roberto and Kotsiopoulos to Simone and on March 9, 2000, picked up money, believed to be rent money, left at a clothing store by Dezotell, for Simone. Id. at pp. 4-5.

    (c) At approximately 1352 on Friday, September 8, 2000, Simone received a call from Michael Dezotell. As noted in my first affidavit dated September 1, 2000, Dezotell is a bookmaker in the Greater Boston Area who pays rent to Simone. Dezotell's voice has been positively identified by both Lieutenant Tutungian and Trooper Scanlan from past electronic surveillance and past personal conversations with Dezotell. Based upon my experience in wiretap investigations, it is my opinion that during this conversation, Dezotell was giving Simone an excuse for being late on his "rent" payment. Specifically, Dezotell was trying to get additional time in which to pay his monthly "Rent" due to Simone, by claiming to have left his house without Simone's cell or home phone number. (See copy of transcript dated September 9, 2000 attached hereto as Exhibit 1 and incorporated herein). During this call, Simone referred to the term "Tomatoes," which is presently believed to be a restaurant called "Gone Tomatoes." Though Simone specifically states "that fuckin clown, Tomatoes, did you see him," I immediately recognized the shortened name "Tomatoes," as that of a restaurant located on the Cape from conversations with Lieutenant Tutungian and Trooper Scanlan. Lieutenant Tutungian and Trooper Scanlan have been receiving confidential information regarding the owners William and Marc Petralia of the restaurant on Cape Cod, called "Gone Tomatoes" and their connection to Michael Dezotell including placing bets through Dezotell's

office. The information regarding "Gone Tomatoes" is being provided by CI-2, who is mentioned in my affidavit dated September 1, 2000 and who provided information in support of the wiretap warrants issued on September 1, 2000. CI-2's information has been corroborated by Bell Atlantic records, which reveal that there is a restaurant named "Gone Tomatoes," which is located on Mashpee Common, in Mashpee, Massachusetts. As detailed below, we have also intercepted a conversation on September 12, 2000, between Simone and Dezotell where Dezotell explicitly refers to "Tomatoes." Id. at pp. 10-11.

(d) During the conversation on September 8, 2000, Simone and Dezotell also spoke about an unknown individual, referred to as "the Jew," who regularly brings merchandise from New York in a truck. It is believed that the merchandise is either stolen or counterfeit because it is sold at prices significantly below market rate. Id. at pp. 10-12 (footnote omitted).

(e) Officers have intercepted criminal communications between Simone and other individuals including Michael Dezotell over the Simone A Telephone. Set forth herein are examples of intercepted calls in which Simone and others have discussed criminal activities namely gaming, extortion and criminal usury. These calls are representative of similar calls intercepted over the Simone A Telephone up to and including 2300 hrs, September 18, 2000. Id. at p. 14.

(f) As noted in footnote one, supra, at approximately 1057, on September 12, 2000, a long telephone conversation was intercepted between Simone and Dezotell. This phone call was initiated by Simone to Dezotell. During this conversation, Simone is clearly upset with Dezotell for not meeting him as promised on Friday, September 8, 2000. Dezotell explains to Simone that the traffic coming up from the Cape delayed him. Dezotell also complained of physical problems with his knees, to which Simone responds upset, "C'mon Mike." I note that "rent" payments are due either at the end or the first of the month. As noted previously in my affidavit dated September 1, 2000, in a conversation intercepted during the Essex Wiretap Investigation, on March 9, 2000, at approximately 4:46 p.m. between Anthony Musto and Kevin Keegan, Musto tells Keegan that he got yelled at by Simone because, Chris Kotsiopoulos failed to make a payment to Simone at the end of the month as required. Id. at p. 15.

(g) Dezotell tells Simone that he has items for him including "Nobska Red," "wine," and "that shit" from "tomatoes" and that he will meet him on Wednesday, September 13, 2000, around 11:00 a.m. On September 13, 2000, Special Service Section members set up physical surveillance of Dezotell and Simone regarding their pre-arranged meeting. Through physical surveillance Dezotell was observed from the time he left his house located at 16 Cricklewood Drive, Stoneham, Massachusetts, until

he met with Simone at Simone's residence in Framingham. Surveillance officers observed Dezotell meeting with Simone in his driveway and observed the two men entering Simone's residence. Despite references to "Nobska Red" and wine, Dezotell did not carry any items in his hands to the meeting. In addition, Troopers were able to look inside Dezotell's vehicle through the windows while it was parked at a hospital en route to the meeting with Simone. No bottles, wine or other items other than some hanging clothes were observed in the vehicle. As a result of the physical surveillance conducted on September 13, 2000, it is the opinion of Lieutenant Tutungian and myself based upon our training and experience that the references to "Nobska Red" (a local Cape Cod wine), together with references to "the wine" and "that shit," are cryptic references to payment made from the owners of "gone Tomatoes" to Simone. Id. at pp. 15-16.

(h) CI-2 met with Lieutenant Tutungian and Trooper Scanlan on September 12, 2000 and told the Troopers that the owners of "Gone Tomatoes" are known to place gaming bets with Dezotell and that Dezotell is known to have loaned them money. CI-2 told the Troopers that the owners are familiar with Simone and that Simone has been to the restaurant. In addition, CI-2 told the Troopers that Dezotell uses Simone's name for collection purposes. CI-2 told the Troopers that he received the above information from his gambling associates who were told directly by Dezotell about the Petralia's placing bets through Dezotell's office and about Dezotell's loans to the Petralias. Id. at p. 16.

(i) I note that during intercepted conversations between Simone and Dezotell that Dezotell has avoided on at least two (2) occasions, giving Simone his cellular telephone number when requested. This allows Dezotell to avoid contact with Simone whenever he wants and places him in control of when he contacts Simone. Id. at p. 16.

(j) The September 12, 2000, intercepted conversation between Dezotell and Simone indicates there is current tension between Vincent Roberto and Dezotell. In addition, this conversation reveals that Dezotell is attempting to create tension between Simone and Roberto by spreading rumors that Simone does not like Roberto. During the September 12, 2000 conversation, Simone is upset at Dezotell for starting rumors that he hates Roberto and orders Dezotell to stop telling people that he hates Roberto and to stop the rumors about any animosity between them. Roberto, it will be recalled from information set forth in my affidavit dated September 1, 2000, is a bookmaker who pays "rent" to Simone and who informs Simone of the existence of other bookmakers. Id. at p. 17.

(k) In light of the above information, and considering that Simone was released from prison in 1998, it is the opinion of myself as well as

Lieutenant Tutungian, that Simone supports his lifestyle and obligations with payments received through gaming, extortion and loansharking. These funds are given to Simone by individuals such as Dezotell when they meet in person. Id. at p. 19.

(l) Interceptions also indicate that Dezotell and others are paying for various items or arranging for services on Simone's behalf. In the September 12, 2000, conversation intercepted between Dezotell and Simone, Dezotell tells Simone that he paid for two (2) bags from "the Jew" for Simone. In addition, intercepted conversations between Simone and Mimi Robert, the wife of Vincent Roberto, indicate that Roberto is responsible for scheduling Simone's maid service. Id. at p. 19.

8. And, in subsequent affidavit, Russolillo consistently made allegations seeking to convince Judge Botsford that Roberto and Dezotell were actual targets. See for example:

(a) 10/4/00 Affidavit at pp. 3-4; 46-47 (alleging probable cause to believe that Roberto Dezotell and others were committing the designated offenses);

(b) 10/4/00 Affidavit at p. 7 (alleging that Roberto and Dezotell were paying rent to Simone);

(c) 10/4/00 Affidavit at pp. 18-21 (referencing intercepted call between Simone and Dezotell and alleging it to be proof that Dezotell was making arrangements to make payment of rent to Simone);

(d) 10/4/00 Affidavit at pp. 23-37 (referencing intercepted calls between Dezotell and Simone and alleging them to be proof that threats were being made against Dezotell in connection with illegal gaming activities);

(e) 10/4/00 Affidavit at p. 39 (alleging "that Simone has interceded or intends to intercede in a dispute between Joseph Salvati, Michael Dezotell and others, representing another faction of organized crime who are attempting to collect illegal gaming or 'rent' money"); also (alleging that "Simone collects rent and/or loan interested payments from bookmaker Michael Dezotell...");

(f) 10/4/00 Affidavit at p. 40 (alleging Simone uses his home to meet and discuss illegal activities with Roberto, Dezotell and others);

(g) 10/19/00 Affidavit at p.8 (alleging that Simone used his home to discuss illegal activities with Roberto and Dezotell and others);

(h) 10/19/00 Affidavit at pp. 9-10 (alleging that Dezotell is a bookmaker

"who meets frequently with Simone to make rent payments to him");

(i) 10/19/00 Affidavit at p. 10 (alleging that Dezotell has been intercepted calling Simone to "discuss 'rent' and/or loan payments that [Dezotell] collected from the owner of a restaurant...called "Gone Tomatoes" and agreeing to meet [at Simone's home] for the purpose of delivering 'rent' payments to Simone and further discussing their extortion, gaming and loansharking activities."); see also pp. 11-13 (alleging similar conversations and activities);

(j) 10/19/00 Affidavit at pp. 13-14 (alleging that Dezotell was being threatened by a "competing faction of organized crime" and that Simone told Dezotell that Roberto was responsible for the threats against Dezotell);

(k) 10/19/00 Affidavit at pp. 33-34 (alleging that Roberto pays rent to Simone; also repeating "with" Simone and repeating allegations about search of Roberto's Florida home);

(l) 10/19/00 Affidavit at pp. 34-35 (discussing intercepted calls between Roberto and Simone wherein they allegedly discuss meetings at Simone's home and payment of rent);

(m) 10/24/00 Affidavit at pp. 5-6; 10-11; 32-34 (alleging probable cause to believe Roberto, Dezotell and others were committing designated offenses);

(n) 10/24/00 Affidavit at p. 12 (alleging Simone used his home to conduct meetings with Roberto, Dezotell and others to discuss designated offenses);

(o) 10/24/00 Affidavit at p. 25 (alleging that Dezotell -- described as an "individual[] associated with Simone" -- was receiving threats from "organized crime faction");

(p) 10/24/00 Affidavit at p. 27 (alleging that Simone threatened Roberto with a gun because he believed Roberto was responsible for threats against Dezotell and others);

(q) 11/10/00 Affidavit at p. 12 (alleging that Simone uses his home to meet with Roberto, Dezotell and others about "their extortion, gaming and loansharking criminal usury activities");

(r) 11/10/00 Affidavit at p. 25 (allegations regarding threats against Dezotell and that Simone was using his home to discuss what to do about them);

(s) 11/10/00 Affidavit at pp. 27-28 (alleging that Roberto visited Simone's home and Simone threatened him with a gun and threatened others as well);

(t) 11/22/00 Affidavit at pp. 8-9; 26-27 (alleging probable cause to believe Roberto and Dezotell, among others, were committing designated offenses);

(u) 11/22/00 at p. 11-12 (alleging that Simone used his home to conduct conversations about designated offenses with Roberto and Dezotell, among others);

(v) 11/22/00 Affidavit at pp. 16-17 (alleging that Simone and Dezotell discussed threats).

For the reasons described in more detail in Defendant's Supplemental

Memorandum, I believe each of the foregoing allegations to be false or misleading.


SWORN TO UNDER THE PAINS AND PENALTIES OF PERJURY THIS 22nd DAY OF OCTOBER, 2004.

/s/ Patricia A. DeJuneas
Patricia A. DeJuneas


## CERTIFICATE OF SERVICE

I, Patricia A. DeJuneas, hereby certify that I have caused a copy of the foregoing document to be served on Assistant United States Attorney Ernest DiNisco by first class mail, this 22nd day of October, 2004.

/s/ Patricia A. DeJuneas
Patricia A. DeJuneas


12

offices" who supervise and receive bets from "street bookies" and carry out other business of the organization; persons working in and supervising "area gaming offices" who receive bets from "local gaming offices," balance the books of the gaming organization and "lay-off" bets, disseminate "lines" on athletic contests, and carry out other business of the organization; "persons in charge" of the organization who ultimately are responsible for the day to day operations of the organization.

72.     Based on the facts and information set forth herein, and on my training and experience, I have formed the opinion that the bookmaking operation/organization under investigation here includes numerous persons other than Joseph Zampanti Jr., Ronald Zampanti, and Alfred Mainero who carry out a variety of functions for the organization.

73.     A primary goal of this investigation is to penetrate the bookmaking operation and conspiracy described in this affidavit, and to identify, apprehend, and bring about the successful prosecution of those persons involved at all levels of this organization and conspiracy, including those persons other than just Joseph Zampanti Jr., Ronald Zampanti, and Alfred Mainero such as the "street bookies," the persons operating "local gaming offices," the persons operating " area bookmaking offices" and the persons at higher levels of the organization.  It is the goal of this investigation to identify, apprehend, and prosecute all of these persons.  It is the goal of this investigation to trace the manner in which the proceeds of the bookmaking operation have been, and are being spent, stored or invested, and to seize and seek forfeiture of these proceeds pursuant to Massachusetts General Law; Chapter 276, sections 1-7.

49

Simone                                                                                                    2105

74.    In my opinion. normal investigative procedures have been tried and have failed to gather sufficient evidence to (1) identify. apprehend and successfully prosecute Joseph Zampanti Jr.. Ronald Zampanti. Alfred Mainero and the other persons with whom they conspire directly or who are involved in various levels of the conspiracy and organization; (2) expose the full scope of the gaming activities of the persons involved in the organization. including Joseph Zampanti Jr.. Ronald Zampanti, and Alfred Mainero; (3) locate. seize and successfully forfeit the proceeds of the gaming activities; and (4) permanently dismantle the criminal activities of this organization.

75.    While sufficient evidence had been gathered through the use of normal investigative procedures to execute one or more search warrants, such a course of action had not. in my opinion. lead to the achievement of the goals of this investigation.

76.    So, too. the continued exclusive reliance on normal investigative procedures is unlikely to result in the collection of sufficient evidence to apprehend, identify, and successfully prosecute all those persons who. like Joseph Zampanti Jr., Ronald Zampanti and Alfred Mainero participate in the various levels of this gaming conspiracy, and to achieve the other goals of this investigation detailed above.

77.    Although I continue to receive information from several of the informants discussed earlier in this affidavit. these informants are unable to penetrate into the organization to any significant degree.  Also. it is my opinion that these informants do not possess sufficient first-

Simone                                                                                          2106

hand information, and are unable to acquire sufficient first-hand information, through which the

continued exclusive reliance on normal investigative procedures is likely to result in the

achievement of the goals of this investigation. Moreover, these informants have provided

cooperation and assistance on the condition that their identities not be revealed, and that they not

be compelled to offer testimony against Joseph Zampanti Jr., Ronald Zampanti, Alfred Mainero,

and their associates. Attempts to have the informants further penetrate this organization as

agents of the police might place them at substantial risk of their roles as informants being

discovered. This, in turn, might place them at substantial risk of being threatened or harmed.

78.    To date, I know of no person willing to assist law enforcement in this investigation who

has sufficient first-hand information to bring about the achievement of the goals of this

investigation based exclusively on normal investigative procedures. A primary goal of this

investigation is to penetrate Zampanti's bookmaking operation and conspiracy and to identify,

apprehend, and bring about the successful prosecution of those persons involved at all levels of

this organization and conspiracy, including those persons other than just Joseph Zampanti Jr.,

Ronald Zampanti and Alfred Mainero such as the "street bookies," the persons operating "local

gaming offices," the persons operating "area bookmaking offices" and the persons at higher

levels of the organization. It is the goal of this investigation to trace the manner in which the

proceeds of the bookmaking operation have been, and are being spent, stored or invested, and to

seize and seek forfeiture of these proceeds pursuant to G.L. c. 276 section 1-7.

51

79.     It is also my opinion that executing a search warrant at 18 Juliette Road , Saugus,

Massachusetts. or other locations discussed herein (assuming probable cause existed to search

the residence) would fail to result in the collection of sufficient evidence to identify, apprehend

and prosecute all persons involved in this organization. and to bring about the achievement of the

other goals of this investigation.  Although it is possible that some records might be found. and

some persons arrested, it is unlikely that the seizure of such records in the arrests of such persons.

without more, would lead to the identification, apprehension and prosecution of all the

participants in the various levels of the organization.  Furthermore, once Alfred Mainero and the

other conspirators learned of the execution of the search warrants, it is likely that records and

other evidence would be destroyed. their operations moved, and the organization's activities

made more secretive.

80.     It is also my opinion that confronting Joseph Zampanti Jr., Ronald Zampanti, Alfred

Mainero, and others whether through a grand jury or less formally, in an attempt to persuade

them to cooperate in this investigation would be futile and would jeopardize the objectives of this

investigation.  If any of these persons refused to cooperate. they would likely alert the other

members of the organization to the existence of this investigation. As such, efforts to identify,

apprehend and prosecute all the members of the conspiracy would be made more difficult.

81.     Only one informant currently assisting law enforcement authorities is willing to attempt

to introduce an undercover officer into the organization.  However. even if a police officer could

place bets with the organization. it is unlikely, particularly without the expenditure of large

Simone                                                                    2108

amounts of money and resources. that the police officer would be able to infiltrate to high enough

levels of the conspiracy to gather sufficient evidence to achieve the goals of this investigation.

82.    Although physical surveillance of Joseph Zampanti Jr. and Ronald Zampanti has been

conducted in the past. I believe that conducting, extensive surveillance poses too great a risk that

they will detect the police conducting surveillance. This, in turn, would jeopardize the

investigation. Also, while physical surveillance might identify other persons with whom Joseph

Zampanti and Ronald Zampanti associate, this information. without more, is not likely to bring

about the achievement of the goals of this investigation.

83.    It is my opinion that continued exclusive reliance on normal investigative procedures

such as  telephone toll analysis and public record analysis will likewise fail to result in the

collection of sufficient evidence to identify and dismantle this entire organization.  It is important

to note all telephone toll information I receive from Bell Atlantic will never be current relying on

normal investigative procedures. since I can only obtain these records approximately two weeks

following the end of the monthly billing cycle for each telephone.  Furthermore, because Bell

Atlantic billing records do not identify local calls. the billing records are of limited assistance.

84.    In summary. since the normal investigative techniques employed in the past and in the

course of this investigation have failed to produce sufficient evidence to identify, apprehend and

prosecute all the members of this organization, and to achieve the goals of this investigation,

there is reason to believe that the continued exclusive use of normal investigative procedures

53

would similarly fail to produce sufficient evidence. As such, I believe that the best available means of identifying, apprehending and prosecuting all the members of this organization and to achieve all of the goals of this investigation, is the use of court authorized electronic surveillance.

85.    If the requested wiretap warrant is issued, the monitoring of communications occurring over the telephone would be executed in the following manner to minimize any invasion of privacy of innocent users of that telephone. The officers who will execute the Court Orders and Warrants, if it is granted, will be aware of the requirements of limiting the interceptions occurring over the telephone lines to conversations material to violations of Massachusetts General Law Chapter 271, Section 17, and Conspiracy to commit same; intend to so limit said interceptions; will conduct the interceptions within the limitation specified in the Orders and Warrants; and will minimize any unnecessary intrusions upon the named individuals' rights of privacy and those of other individuals who may use the telephone lines. To minimize the risk of unauthorized or improper monitoring of oral wire communications, monitoring instructions will be issued to all law enforcement officers designated to execute the Orders and Warrants.

86.    If this warrant is issued it is expected that the telephones will continue to be used by Joseph Zampanti Jr., Ronald Zampanti and others to conduct their illegal gaming activities after the first interception of their communications, in that electronic surveillance of only one intercepted communication would not be sufficient to achieve the goals of this investigation, including the identification, apprehension and prosecution of all members of this conspiracy. As such, I request that authorization to conduct electronic surveillance not automatically terminate

54

32.)    Based on the facts and information set forth herein. and in my attached affidavit dated

January 13th. 2000. I believe that I have probable cause to believe that the cellular telephone

number **(781) 284-7487** has been and will continue to be used by Craig P. Nolan and others

associated with him in furtherance of. and to facilitate an unlawful gaming business. and that

electronic surveillance of the wire communications occurring over this telephone will result in

the seizure of material evidence of violations of Massachusetts General Law Chapter 271,

Section 17B, as well as the Commonwealth's other laws prohibiting gaming.


33.)    A primary goal of this investigation continues to be to penetrate the bookmaking

operation and conspiracy described in this affidavit. and to identify, apprehend. and bring about

the successful prosecution of those persons involved at all levels of this organization and

conspiracy, including those persons other than just  Joseph Zampanti Jr., Ronald Zampanti.

Carmine Damelio, Vincent Roberto, and Craig Nolan, such as the "street bookies," the persons

operating "local gaming offices." the persons operating "area bookmaking offices." and the

persons at higher levels of the organization.  Other primary goals of this investigation include:

    (A)    Penetrating other gaming organizations doing business with the Zampanti gaming

    organization. including those organizations placing lay-off bets to the Zampanti

    organization and gaming organizations furnishing the "lines" and receiving lay-off bets

    from the Zampanti organization, and identifying, apprehending and prosecuting those

    people involved in these organizations; and

    (B)    Tracing the manner in which the proceeds of the identified bookmaking operation

    and organizations have been. and are being spent. stored or invested. and to seize and

28

seek forfeiture of these proceeds pursuant to Massachusetts General Law Chapter 276.

Sections 1-7.

34.)    It continues to be my opinion that normal investigative procedures have been tried and

have failed to gather sufficient evidence to:

(1) identify, apprehend and successfully prosecute Joseph Zampanti Jr., Ronald

Zampanti, Carmine Damelio, Vincent Roberto, Craig Nolan and others with whom they

conspire directly or who are involved in the various levels of the conspiracy and

organization;

(2) identify, apprehend and successfully prosecute those persons involved in other

gaming organizations doing business with the Zampanti gaming organization;

(3) expose the full scope of the gaming activities of the persons involved in these

organizations including Joseph Zampanti Jr., Ronald Zampanti, Carmine Damelio,

Vincent Roberto, Craig Nolan ;

(4) locate, seize and successfully forfeit the proceeds of the gaming activities; and

(5) permanently dismantle the criminal activities of these organizations.

35.)    While sufficient evidence may have been gathered through the use of normal

investigative procedures to execute one or more search warrants, such a course of action would

not, in my opinion, lead to the achievement of the goals of this investigation.

29

36.)    So, too, the continued exclusive reliance on normal investigative procedures is unlikely to result in the collection of sufficient evidence to apprehend, identify, and successfully prosecute all those persons who, like Joseph Zampanti Jr., Ronald Zampanti, Carmine Damelio, Vincent Roberto, Craig Nolan, participate in the various levels of this gaming conspiracy, and to achieve the other goals of this investigation detailed above.

37.)    Although I continue to receive information from several of the informants discussed earlier in this affidavit, these informants are unable to penetrate into the organization to any significant degree. Also, it is my opinion that these informants do not possess sufficient first-hand information, and are unable to acquire sufficient first-hand information, through which the continued exclusive reliance on normal investigative procedures is likely to result in the achievement of the goals of this investigation. Moreover, these informants have provided cooperation and assistance on the condition that their identities not be revealed, and that they not be compelled to offer testimony against Joseph Zampanti Jr., Ronald Zampanti, Carmine Damelio, Vincent Roberto, Craig Nolan, and their associates. I continue to believe that attempts to have the informants further penetrate this organization as agents of the police might place them at substantial risk of their roles as informants being discovered. This, in turn, might place them at substantial risk of being threatened or harmed.

38.)    I continue to know of no person willing to assist law enforcement in this investigation who has sufficient first-hand information to bring about the achievement of the goals of this investigation based exclusively on normal investigative procedures.

30

39.)    It continues to be my opinion that executing a search warrant at any of the locations

discussed herein (assuming probable cause existed to search these locations) would fail to result

in the collection of sufficient evidence to identify, apprehend and prosecute all persons involved

in this organization, and to bring about the achievement of the other goals of this investigation.

Although it is possible that some records might be found, and some persons arrested, it is

unlikely that the seizure of such records in the arrests of such persons, without more, would lead

to the identification, apprehension and prosecution of all the participants in the various levels of

the organization.  Furthermore, once Joseph Zampanti Jr., Ronald Zampanti, Carmine Damelio,

Vincent Roberto, Craig Nolan, and the other conspirators learned of the execution of the search

warrants, it is likely that records and other evidence would be destroyed, their operations moved,

and the organization's activities made more secretive.

40.)    It is also my opinion that confronting Joseph Zampanti Jr., Ronald Zampanti, Carmine

Damelio, Vincent Roberto, Craig Nolan, whether through a grand jury or less formally, in an

attempt to persuade them to cooperate in this investigation would be futile and would jeopardize

the objectives of this investigation.  If any of these persons refused to cooperate, they would

likely alert the other members of the organization to the existence of this investigation.  As such,

efforts to identify, apprehend and prosecute all the members of the conspiracy would be made

more difficult.

41.)    Police officers assigned to this investigation continue to conduct physical surveillance of

the targets of this investigation including Joseph Zampanti Jr., Ronald Zampanti, Carmine

31

Damelio. Vincent Roberto. Craig Nolan. but I continue to believe that conducting. extensive surveillance poses too great a risk that they will detect the police conducting surveillance. and that physical surveillance. without electronic surveillance is not likely to bring about the achievement of the goals of this investigation.

42.)    It is my opinion that continued exclusive reliance on normal investigative procedures such as telephone toll analysis and public record analysis will likewise fail to result in the collection of sufficient evidence to dismantle this entire organization and bring about the goals of this investigation.

43.)    In summary, it is my opinion and that of other investigators the goals of this investigation will not be achieved without continued electronic surveillance after January 28th, 2000 (when the interception periods of the warrants issued on January 13th, 2000, terminate), and we proceed after January 28th. 2000 in this investigation relying only on normal investigative techniques. I believe that the best available means of identifying, apprehending and prosecuting all the members of this organization. and to achieve the goals of this investigation, is the continued use of court authorized electronic surveillance.

44.)    If the requested wiretap warrants are issued. the monitoring of communications occurring over the telephones would be executed in the following manner to minimize any invasion of privacy of innocent users of that telephones.  The officers who will execute the Court Orders and Warrants. if they are granted. will be aware of the requirements of limiting the interceptions

32

offices." and the persons at higher levels of the organization.  Other primary goals of this investigation include:

    A.)    Penetrating other gaming organizations doing business with the Zampanti gaming organization, including those organizations placing lay-off bets to the Zampanti organization and gaming organizations furnishing the "lines" and receiving lay-off bets from the Zampanti organization, and identifying, apprehending and prosecuting those people involved in these organizations; and

    B.)    Tracing the manner in which the proceeds of the identified bookmaking operation and organizations have been, and are being spent, stored or invested, and to seize and seek forfeiture of these proceeds pursuant to Massachusetts General Law Chapter 276, Sections 1-7.

27.    It continues to be my opinion that normal investigative procedures have been tried and have failed to gather sufficient evidence to:

    1.)    Identify, apprehend and successfully prosecute Joseph Zampanti Jr., Ronald Zampanti, Carmine Damelio, Vincent Roberto, Anthony Musto, Craig Nolan and others wit

    2.)    Identify, apprehend and successfully prosecute those persons involved in other gaming organizations doing business with the Zampanti gaming organization;

    3.)    Expose the full scope of the gaming activities of the persons involved in these organizations including Joseph Zampanti Jr., Ronald Zampanti, Carmine Damelio, Vincent Roberto, Anthony Musto, and Craig Nolan;

    4.)    Locate, seize and successfully forfeit the proceeds of the gaming activities; and

    5.)    Permanently dismantle the criminal activities of these organizations.

38

Simone    2271

28.    While sufficient evidence may have been gathered through the use of normal investigative procedures to execute one or more search warrants, such a course of action would not, in my opinion, lead to the achievement of the goals of this investigation.

29.    So, too, the continued exclusive reliance on normal investigative procedures is unlikely to result in the collection of sufficient evidence to apprehend, identify, and successfully prosecute all those persons who, like Joseph Zampanti Jr., Ronald Zampanti, Carmine Damelio, Vincent Roberto, Craig Nolan, and Anthony Musto, participate in the various levels of this gaming conspiracy, and to achieve the other goals of this investigation detailed above.

30.    Although I continue to receive information from several of the informants discussed earlier in this affidavit, these informants are unable to penetrate into the organization to any significant degree.  Also, it is my opinion that these informants do not possess sufficient first-hand information, and are unable to acquire sufficient first-hand information, through which the continued exclusive reliance on normal investigative procedures is likely to result in the achievement of the goals of this investigation.  Moreover, these informants have provided cooperation and assistance on the condition that their identities not be revealed, and that they not be compelled to offer testimony against Joseph Zampanti Jr., Ronald Zampanti, Carmine Damelio, Vincent Roberto, Craig Nolan, Anthony Musto, and their associates.  I continue to believe that attempts to have the informants further penetrate this organization as agents of the police might place them at substantial risk of their roles as informants being discovered.  This, in

39

turn. might place them at substantial risk of being threatened or harmed.

31.    I continue to know of no person willing to assist law enforcement in this investigation

who has sufficient first-hand information to bring about the achievement of the goals of this

investigation based exclusively on normal investigative procedures.

32.    It continues to be my opinion that executing a search warrant at any of the locations

discussed herein (assuming probable cause existed to search these locations) would fail to result

in the collection of sufficient evidence to identify. apprehend and prosecute all persons involved

in this organization, and to bring about the achievement of the other goals of this investigation.

Although it is possible that some records might be found. and some persons arrested. it is

unlikely that the seizure of such records in the arrests of such persons. without more. would lead

to the identification. apprehension and prosecution of all the participants in the various levels of

the organization.  Furthermore. once Joseph Zampanti Jr.. Ronald Zampanti. Carmine Damelio.

Vincent Roberto. Craig Nolan. Anthony Musto. and the other conspirators learned of the

execution of the search warrants. it is likely that records and other evidence would be destroyed.

their operations moved. and the organization's activities made more secretive.

33.    It is also my opinion that confronting Joseph Zampanti Jr.. Ronald Zampanti. Carmine

Damelio. Vincent Roberto. Craig Nolan. and Anthony Musto. whether through a grand jury or

less formally, in an attempt to persuade them to cooperate in this investigation would be futile

and would jeopardize the objectives of this investigation.  If any of these persons refused to

40

cooperate. they would likely alert the other members of the organization to the existence of this investigation. As such. efforts to identify. apprehend and prosecute all the members of the conspiracy would be made more difficult.

34.    Police officers assigned to this investigation continue to conduct physical surveillance of the targets of this investigation including Joseph Zampanti Jr.. Ronald Zampanti. Carmine Damelio. Vincent Roberto. Craig Nolan. and Anthony Musto. but I continue to believe that conducting. extensive surveillance poses too great a risk that they will detect the police conducting surveillance. and that physical surveillance. without electronic surveillance is not likely to bring about the achievement of the goals of this investigation.

35.    It is my opinion that continued exclusive reliance on normal investigative procedures such as telephone toll analysis and public record analysis will likewise fail to result in the collection of sufficient evidence to dismantle this entire organization and bring about the goals of this investigation.

36.    In summary. it is my opinion and that of other investigators the goals of this investigation will not be achieved without continued electronic surveillance after February 12. 2000 (when the interception periods of the warrants issued on January 28. 2000. terminate). and we proceed after February 12. 2000 in this investigation relying only on normal investigative techniques. I believe that the best available means of identifying, apprehending and prosecuting all the members of this organization. and to achieve the goals of this investigation. is the continued use

41

of court authorized electronic surveillance.

37.    If the requested wiretap warrants are issued, the monitoring of communications occurring

over the telephones would be executed in the following manner to minimize any invasion of

privacy of innocent users of that telephones.  The officers who will execute the Court Orders

and Warrants, if they are granted, will be aware of the requirements of limiting the interceptions

occurring over the telephone lines to conversations material to violations of Massachusetts

General Law Chapter 271, Section 17, and Conspiracy to commit same; intend to so limit said

interceptions; will conduct the interceptions within the limitation specified in the Orders and

Warrants; and will minimize any unnecessary intrusions upon the named individuals' rights of

privacy and those of other individuals who may use the telephone lines.  To minimize the risk of

unauthorized or improper monitoring of oral wire communications, monitoring instructions will

be issued to all law enforcement officers designated to execute the Orders and Warrants.

38.    If this warrant is issued it is expected that the targets telephones will continue to be used

by Joseph Zampanti Jr., Ronald Zampanti, Carmine Damelio, Vincent Roberto, Craig Nolan,

Anthony Musto, and others in furtherance of their illegal gaming activities.  It is my belief that a

single interception will not be sufficient to achieve the goals of this investigation which includes

the identification, apprehension and prosecution of all members of this conspiracy.  As such, I

request that authorization to conduct electronic surveillance not automatically terminate when the

first described communications has been first obtained.

42

39.    For the following reasons. I believe that service of this affidavit. the electronic surveillance warrant, and the related documents. prior to the execution of the warrant would compromise the objectives of this investigation:

A.)    This matter involves an ongoing investigation of a number of persons participating in an organization involved in illegal gaming;

B.)    This affidavit contains detailed facts and information concerning the illegal activities of Joseph Zampanti Jr., Ronald Zampanti. Carmine Damelio. Vincent Roberto. Craig Nolan. Anthony Musto. and others relating to illegal gaming;

C. )    This affidavit details the cooperation of several informants:

D.)    This investigation is expected to continue after the first interception of oral or wire communications pursuant to the warrant.  Thus. continued secrecy is necessary to the successful apprehension and prosecution of the individuals involved in the illegal gaming activities: and

E.)    It is my opinion that if Joseph Zampanti Jr., Ronald Zampanti. Carmine Damelio. Vincent Roberto. Craig Nolan. Anthony Musto. and the other persons identified herein were to receive notice of this investigation and the intention of utilizing electronic surveillance. they would stop using the telephones identified in this affidavit. and otherwise adopt new methods of conducting their illegal activities. before this warrant could be executed frustrating the very purpose for which it was sought.

43

27.    A primary goal of this investigation continues to be to penetrate the bookmaking operation and conspiracy described in this affidavit, and to identify, apprehend, and bring about the successful prosecution of those persons involved at all levels of this organization and conspiracy, including those persons other than just Joseph Zampanti Jr., Ronald Zampanti, Carmine Damelio, Vincent Roberto, Anthony Musto, and Craig Nolan, such as the "street bookies," the persons operating "local gaming offices," the persons operating "area bookmaking offices," and the persons at higher levels of the organization. Other primary goals of this investigation include:

A.)    Penetrating other gaming organizations doing business with the Zampanti gaming organization, including the Roberto gaming organization, and other organizations placing lay-off bets to the Zampanti organization and gaming organizations furnishing the "lines" and receiving lay-off bets from the Zampanti organization, and identifying, apprehending and prosecuting those people involved in these organizations; and

B.)    Tracing the manner in which the proceeds of the identified bookmaking operation and organizations have been, and are being spent, stored or invested, and to seize and seek forfeiture of these proceeds pursuant to Massachusetts General Law Chapter 276, Sections 1-7.

28.    It continues to be my opinion that normal investigative procedures have been tried and have failed to gather sufficient evidence to:

1.)    Identify, apprehend and successfully prosecute Joseph Zampanti Jr., Ronald Zampanti, Carmine Damelio, Vincent Roberto, Anthony Musto, Craig Nolan and others with whom they conspire directly or who are involved in the various levels of the conspiracy and organization;

2.)    Identify, apprehend and successfully prosecute those persons involved in other gaming organizations doing business with the Zampanti gaming organization;

3.)    Expose the full scope of the gaming activities of the persons involved in these organizations including Joseph Zampanti Jr., Ronald Zampanti, Carmine Damelio, Vincent Roberto, Anthony Musto, and Craig Nolan;

4.)    Locate, seize and successfully forfeit the proceeds of the gaming activities; and

5.)    Permanently dismantle the criminal activities of these organizations.

29.    While sufficient evidence may have been gathered through the use of normal investigative procedures to execute one or more search warrants, such a course of action would not, in my opinion, lead to the achievement of the goals of this investigation.

30.    So, too, the continued exclusive reliance on normal investigative procedures is unlikely to result in the collection of sufficient evidence to apprehend, identify, and successfully prosecute all those persons who, like Joseph Zampanti Jr., Ronald Zampanti, Carmine Damelio, Vincent Roberto, Craig Nolan, and Anthony Musto, participate in the various levels of this gaming conspiracy, and to achieve the other goals of this investigation detailed above.

31.    Although I continue to receive information from several of the informants discussed earlier in this affidavit, these informants are unable to penetrate into the organization to any significant degree. Also, it is my opinion that these informants do not possess sufficient first-hand information, and are unable to acquire sufficient first-hand information, through which the continued exclusive reliance on normal investigative procedures is likely to result in the achievement of the goals of this investigation.

Moreover, these informants have provided cooperation and assistance on the condition that their identities not be revealed, and that they not be compelled to offer testimony against Joseph Zampanti Jr., Ronald Zampanti, Carmine Damelio, Vincent Roberto, Craig Nolan, Anthony Musto, and their associates. I continue to believe that attempts to have the informants further penetrate this organization as agents of the police might place them at substantial risk of their roles as informants being discovered. This, in turn, might place them at substantial risk of being threatened or harmed.

32.    I continue to know of no person willing to assist law enforcement in this investigation who has sufficient first-hand information to bring about the achievement of the goals of this investigation based exclusively on normal investigative procedures.

33.    It continues to be my opinion that executing a search warrant at any of the locations discussed herein (assuming probable cause existed to search these locations) would fail to result in the collection of sufficient evidence to identify, apprehend and prosecute all persons involved in this organization, and to bring about the achievement of the other goals of this investigation. Although it is possible that some records might be found, and some persons arrested, it is unlikely that the seizure of such records in the arrests of such persons, without more, would lead to the identification, apprehension and prosecution of all the participants in the various levels of the organization. Furthermore, once Joseph Zampanti Jr., Ronald Zampanti, Carmine Damelio, Vincent Roberto, Craig Nolan, Anthony Musto, and the other conspirators learned of the execution of the search warrants, it is likely that records and other evidence would be destroyed, their operations moved, and the organization's activities made more secretive.

34.    It is also my opinion that confronting Joseph Zampanti Jr., Ronald Zampanti, Carmine Damelio, Vincent Roberto, Craig Nolan, and Anthony Musto, whether through a

grand jury or less formally, in an attempt to persuade them to cooperate in this investigation would be futile and would jeopardize the objectives of this investigation. If any of these persons refused to cooperate, they would likely alert the other members of the organization to the existence of this investigation. As such, efforts to identify, apprehend and prosecute all the members of the conspiracy would be made more difficult.

35.    Police officers assigned to this investigation continue to conduct physical surveillance of the targets of this investigation including Joseph Zampanti Jr., Ronald Zampanti, Carmine Damelio, Vincent Roberto, Craig Nolan, and Anthony Musto, but I continue to believe that conducting, extensive surveillance poses too great a risk that they will detect the police conducting surveillance, and that physical surveillance, without electronic surveillance is not likely to bring about the achievement of the goals of this investigation.

36.    It is my opinion that continued exclusive reliance on normal investigative procedures such as telephone toll analysis and public record analysis will likewise fail to result in the collection of sufficient evidence to dismantle this entire organization and bring about the goals of this investigation.

37.    In summary, it is my opinion and that of other investigators the goals of this investigation will not be achieved without continued electronic surveillance after February 27, 2000 (when the interception periods of the warrants issued on February 11, 2000, terminate), and we proceed after February 27, 2000 in this investigation relying only on normal investigative techniques. I believe that the best available means of identifying, apprehending and prosecuting all the members of this organization, and to

achieve the goals of this investigation, is the continued use of court authorized electronic surveillance.

38.    If the requested wiretap warrants are issued, the monitoring of communications occurring over the telephones would be executed in the following manner to minimize any invasion of privacy of innocent users of that telephones.  The officers who will execute the Court Orders and Warrants, if they are granted, will be aware of the requirements of limiting the interceptions occurring over the telephone lines to conversations material to violations of Massachusetts General Law Chapter 271, Section 17, and Conspiracy to commit same; intend to so limit said interceptions; will conduct the interceptions within the limitation specified in the Orders and Warrants; and will minimize any unnecessary intrusions upon the named individuals' rights of privacy and those of other individuals who may use the telephone lines.  To minimize the risk of unauthorized or improper monitoring of oral wire communications, monitoring instructions will be issued to all law enforcement officers designated to execute the Orders and Warrants.

39.    If this warrant is issued it is expected that the targets telephones will continue to be used by Joseph Zampanti Jr., Ronald Zampanti, Carmine Damelio, Vincent Roberto, Craig Nolan, Anthony Musto, and others in furtherance of their illegal gaming activities. It is my belief that a single interception will not be sufficient to achieve the goals of this investigation which includes the identification, apprehension and prosecution of all members of this conspiracy.  As such, I request that authorization to conduct electronic surveillance not automatically terminate when the first described communications has been first obtained.



occurring over this telephone will result in the seizure of material evidence of violations of Massachusetts General Law Chapter 271, Section 17B, as well as the Commonwealth's other laws prohibiting gaming.

50.     A primary goal of this investigation continues to be to penetrate the bookmaking operation and conspiracy described in this affidavit, and to identify, apprehend, and bring about the successful prosecution of those persons involved at all levels of this organization and conspiracy, including those persons other than just Frederick Simone, Joseph Zampanti Jr., Ronald Zampanti, Carmine Damelio, Vincent Roberto, Chris Kotsiopoulos, Anthony Musto, and Craig Nolan, such as the "street bookies," the persons operating "local gaming offices," the persons operating "area bookmaking offices," and the persons at higher levels of the organization.  Other primary goals of this investigation include:


A.)     Penetrating other gaming organizations doing business with the Zampanti gaming organization, including the Roberto gaming organization, and other organizations placing lay-off bets to the Zampanti organization and gaming organizations furnishing the "lines" and receiving lay-off bets from the Zampanti organization, and identifying, apprehending and prosecuting those  people involved in these organizations; and


B.)     Tracing the manner in which the proceeds of the identified bookmaking operation and organizations have been, and are being spent, stored or invested, and to seize and seek forfeiture of these proceeds pursuant to Massachusetts General Law Chapter 276, Sections 1-7.

Simone                                                                        2501

C.)    Identifying the manner and methods of the criminal usury business involving Frank Ciampa. Joseph Zampanti Jr., and Carmine Damelio. in order to fully uncover the scope of said business.

51.    It continues to be my opinion that normal investigative procedures have been tried and have failed to gather sufficient evidence to:

1.)    Identify. apprehend and successfully prosecute Frederick Simone. Joseph Zampanti Jr., Ronald Zampanti. Carmine Damelio. Vincent Roberto. Chris Kotsiopoulos. Anthony Musto. Craig Nolan and others with whom they conspire directly or who are involved in the various levels of the conspiracy and organization:

2.)    Identify. apprehend and successfully prosecute those persons involved in other gaming organizations doing business with the Zampanti gaming organization:

3.)    Identify. apprehend and successfully prosecute those persons involved in Ciampa's criminal usury business.

4.)    Expose the full scope of the gaming activities of the persons involved in these organizations including Frederick Simone. Joseph Zampanti Jr., Ronald Zampanti. Carmine Damelio. Vincent Roberto. Chris Kotsiopoulos. Anthony Musto, and Craig Nolan:

5.)    Expose the full scope of the criminal usury activities involving Frank Ciampa. Joseph Zampanti Jr., and Carmine Damelio:

6.)    Locate. seize and successfully forfeit the proceeds of the gaming activities; and criminal usury activities; and

7.)    Permanently dismantle the criminal activities of these organizations.

52.    While sufficient evidence may have been gathered through the use of normal investigative procedures to execute one or more search warrants, such a course of action would not, in my opinion, lead to the achievement of the goals of this investigation.

53.    So, too, the continued exclusive reliance on normal investigative procedures is unlikely to result in the collection of sufficient evidence to apprehend, identify, and successfully prosecute all those persons who, like Frederick Simone, Joseph Zampanti Jr., Ronald Zampanti, Carmine Damelio, Vincent Roberto, Chris Kotsiopoulos, Craig Nolan, Anthony Musto, and Frank Ciampa, participate in the various levels of this gaming conspiracy, criminal usury conspiracy, and to achieve the other goals of this investigation detailed above.

54.    Although I continue to receive information from several of the informants discussed earlier in this affidavit, these informants are unable to penetrate into the organization to any significant degree.  Also, it is my opinion that these informants do not possess sufficient first-hand information, and are unable to acquire sufficient first-hand information, through which the continued exclusive reliance on normal investigative procedures is likely to result in the achievement of the goals of this investigation. Moreover, these informants have provided cooperation and assistance on the condition that their identities not be revealed, and that they not be compelled to offer testimony against Frederick Simone, Joseph Zampanti Jr., Ronald Zampanti, Carmine Damelio, Vincent Roberto, Chris Kotsiopoulos, Craig Nolan, Anthony Musto, Frank Ciampa, and their associates.  I continue to believe that attempts to have the informants further penetrate this organization as agents of the police might place them at substantial risk of their roles as informants being discovered.  This, in turn, might place them at substantial risk of being threatened or harmed.

49

55.    I continue to know of no person willing to assist law enforcement in this
investigation who has sufficient first-hand information to bring about the achievement of
the goals of this investigation based exclusively on normal investigative procedures.

56.    It continues to be my opinion that executing a search warrant at any of the
locations discussed herein (assuming probable cause existed to search these locations)
would fail to result in the collection of sufficient evidence to identify, apprehend and
prosecute all persons involved in this organization, and to bring about the achievement of
the other goals of this investigation. Although it is possible that some records might be
found, and some persons arrested, it is unlikely that the seizure of such records and  the
arrests of such persons, without more, would lead to the identification, apprehension and
prosecution of all the participants in the various levels of the organization.  Furthermore,
once Frederick Simone, Joseph Zampanti Jr., Ronald Zampanti, Carmine Damelio,
Vincent Roberto, Chris Kotsiopoulos, Craig Nolan, Anthony Musto, Frank Ciampa, and
the other conspirators learned of the execution of the search warrants, it is likely that
records and other evidence would be destroyed, their operations moved, and the
organization's activities made more secretive.

57.    It is also my opinion that confronting Frederick Simone, Joseph Zampanti Jr.,
Ronald Zampanti, Carmine Damelio, Vincent Roberto, Chris Kotsiopoulos, Craig Nolan,
Anthony Musto, and Frank Ciampa, whether through a grand jury or less formally, in an
attempt to persuade them to cooperate in this investigation would be futile and would
jeopardize the objectives of this investigation.  If any of these persons refused to
cooperate, they would likely alert the other members of the organization to the existence
of this investigation.  As such, efforts to identify, apprehend and prosecute all the
members of the conspiracy would be made more difficult.

58.    Police officers assigned to this investigation continue to conduct physical surveillance of the targets of this investigation including Frederick Simone. Joseph Zampanti Jr.. Ronald Zampanti. Carmine Damelio. Vincent Roberto. Chris Kotsiopoulos. Craig Nolan. Anthony Musto. and Frank Ciampa. but I continue to believe that conducting. extensive surveillance poses too great a risk that they will detect the police conducting surveillance. and that physical surveillance. without electronic surveillance is not likely to bring about the achievement of the goals of this investigation.

59.    It is my opinion that continued exclusive reliance on normal investigative procedures such as telephone toll analysis and public record analysis will likewise fail to result in the collection of sufficient evidence to dismantle this entire organization and bring about the goals of this investigation.

60.    In summary. it is my opinion and that of other investigators the goals of this investigation will not be achieved without continued electronic surveillance after March 13. 2000 (when the interception periods of the warrants issued on February 28. 2000. terminate). and we proceed after March 13. 2000 in this investigation relying only on normal investigative techniques. I believe that the best available means of identifying. apprehending and prosecuting all the members of this organization. and to achieve the goals of this investigation. is the continued use of court authorized electronic surveillance.

It should be noted that during our investigation. we have previously identified Carmine T. Damlio as a named intercepted party. Refer to previous affidavits. As a result of communications with Boston Police Department/Suffolk District Attorney's Office we have been apprised that the same Mr. Damilio is a named party in an